**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-4605**

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

      v.

DENNIS EARL LEDBETTER,

             Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.   Liam O'Grady, District Judge.  (1:08-cr-00482-LO-1)

Submitted:  May 21, 2010                Decided:  June 7, 2010

Before SHEDD and DAVIS, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

Michael S. Arif, MARTIN, ARIF & GREEN, PLC, Springfield, Virginia, for Appellant.   Neil H. MacBride, United States Attorney, Benjamin L. Hatch, Assistant United States Attorney, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

A federal grand jury indicted Dennis Earl Ledbetter, charging him with conspiracy to commit armed robbery, in violation of 18 U.S.C. § 371 (Count 1); armed bank robbery, in violation of 18 U.S.C. §§ 2113(a) and (d) and (2) (Count 2); and use of a firearm during a crime of violence, in violation of 18 U.S.C. §§ 2 and 924(c)(1)(A) (Count 3). Ledbetter pleaded guilty to Count 2 and was convicted, after a bench trial, of Counts 1 and 3. On appeal, Ledbetter contests the sufficiency of the evidence supporting the convictions on Counts 1 and 3 and, for the following reasons, we affirm.

## I.

On the morning of October 23, 2008, at approximately 10 a.m., a short, somewhat heavyset black male, later identified as John Wayne Morton, entered the Commerce Bank in Dumfries, Virginia, wearing sunglasses and a ski mask. The man brandished a firearm, ordered all of the patrons on the ground, and commanded the tellers to empty their tills. At least one teller handed Morton money that included a dye pack. Morton also took a black shaving kit that a customer had left on the counter, which contained roughly $1100 in cash, mostly small denominations. In total, Morton took about $8500 from the bank.

2

A second black male, later identified as Ledbetter, wore a mask over his face and stood by the door, holding it open for their escape. One of the tellers made eye contact with Ledbetter during the robbery, and the teller testified that Ledbetter was looking into the bank. Ledbetter also drove the getaway car, a Lincoln Town Car belonging to Morton's mother, from the bank. While in the car, one of the dye packs exploded, burning Morton's leg.

About thirty minutes prior to the robbery, an employee with a self-storage facility located on the street behind the bank saw a dark-colored Lincoln Town Car or Cadillac parked on a small incline on the street. After the car sat for fifteen minutes, the employee became concerned, and approached the vehicle, where he saw two men: a heavy-set black male in the front seat and another person in the back seat, who appeared to be putting something over his face and then taking it off. The employee watched the car move down the hill and park near his own vehicle; he returned to the self-storage facility to assist a customer and, by the time he returned, the car was gone.

Later that day, around 3 p.m., Ledbetter entered the Rent-A-Center in Landover, Maryland, near his home, to pay an overdue account. According to the clerk, Ledbetter, who worked at an International House of Pancakes (IHOP) restaurant, was wearing his uniform. The clerk requested three weeks of

3

payments, but Ledbetter informed her that he was low on money; they eventually agreed to a two-week payment of $99.48. Ledbetter paid the amount in mostly tattered five and ten dollar bills, although the clerk saw Ledbetter holding a one-and-a-half inch roll of money.

One week later, on October 31, 2008, agents with the Federal Bureau of Investigation (FBI) arrested Morton, who lived in Prince George's County, Maryland, for the crime. Several days later, Ledbetter, Morton's cousin, turned himself into authorities for his participation in the robbery.

Based upon these events, a federal grand jury indicted Ledbetter on December 4, 2008, charging him with conspiracy to commit armed robbery, in violation of 18 U.S.C. § 371 (Count 1); armed bank robbery, in violation of 18 U.S.C. §§ 2113(a) and (d) and (2) (Count 2); and use of a firearm during a crime of violence, in violation of 18 U.S.C. §§ 2 and 924(c)(1)(A) (Count 3). On January 23, 2009, Ledbetter pleaded guilty to Count 2, armed bank robbery. As part of the guilty plea, Ledbetter agreed to a statement of facts that provided that "[b]efore entering the bank, John Wayne Morton put on a mask and Dennis Earl Ledbetter tied a shirt around his face to disguise his identity." The statement of facts also provided that Morton brandished a firearm during the robbery, that Ledbetter stood by

the front door to act as a lookout, and that Ledbetter drove the getaway car, Morton's mother's vehicle.

On February 10, 2009, Ledbetter, who had waived a jury, was tried by the district court on Counts 1 and 3. Both Morton and Ledbetter testified extensively at the trial, although their accounts differed dramatically as to the planning of the crime, the ownership of the gun used in the crime, and the aftermath of the robbery. Specifically, Morton, testifying for the Government, stated that Ledbetter supplied the gun for the robbery and chose the bank.[1] According to Morton, Ledbetter forced Morton to commit the robbery, drove the getaway car, and burned the stained clothing and money behind Morton's apartment in Suitland, Maryland. Morton also testified that after the robbery Ledbetter took $500 in cash when he left for work and that Ledbetter returned one week later and advised Morton's mother to remove the license plates from her car.

In contrast, Ledbetter testified that he did not supply the gun for the robbery, did not know that Morton was going to use a gun, did not see Morton brandishing the gun during the robbery, and did not want Morton to rob the bank.

---

[1] In support of the claim that Ledbetter chose which bank to rob, Morton noted that Ledbetter had previously lived in northern Virginia, while Morton had never lived outside of Prince George's County, Maryland, and was unfamiliar with the northern Virginia area.

Ledbetter conceded that he pulled his shirt over his face and assisted Morton by holding the door and driving the getaway car. Ledbetter testified that he made the decision to help Morton just prior to the robbery. Ledbetter also testified that he did not receive any money from the robbery and that when they returned to Morton's apartment he left to report for work at IHOP.

Ledbetter testified that when he returned to Morton's apartment one week after the robbery, he advised Morton's mother to take off her car's tags and then removed them while she watched. Ledbetter also admitted that, during his pretrial incarceration, he told his grandmother what he termed the "original truth," that he knew Morton was going to use a gun in the robbery and that it made him nervous.

The district court found Ledbetter guilty on both counts. The district court first announced that it did not "credit Mr. Morton's testimony that he was threatened by [Ledbetter] or that this was purely [Ledbetter's] idea and that he went kicking and screaming into his participation." Instead, the district court found "the evidence makes clear . . . that this was a bank robbery committed by two cousins who have known each other for 25 years who together planned and executed this robbery in a conspiracy." The district court first found Ledbetter guilty under the principles announced in <u>Pinkerton v.</u>

6

United States, 328 U.S. 640, 646-47 (1946), because Morton brandished a gun in furtherance of their conspiracy to rob the bank. In the alternative, the district court found that Ledbetter knew that Morton had a gun and was going to use it during the robbery. The district court noted that the bank surveillance video showed Ledbetter looking into the bank during most of the robbery and that Morton consistently displayed the gun during the robbery.

The district court also found that portions of Ledbetter's testimony were "undermined by several inconsistencies." These inconsistencies included the testimony of Aaron Hammond, the self-storage facility employee, that he saw Ledbetter pulling a shirt over his face trying out disguises thirty minutes before the robbery — testimony that suggested to the district court "a plan, a calm and calculating participation . . . long before you've admitting knowing that there was going to be a bank robbery." Moreover, the district court found Ledbetter's testimony that he did not know the area inconsistent with his ability to drive "without error" back onto the interstate after the robbery. In addition, the district court found incredible Ledbetter's testimony that he did not see the bank proceeds in Morton's hands as he exited the bank. The district court stated that the surveillance video clearly showed the money "literally taking up his entire midsection" while

7

Ledbetter "[was] looking at him and making sure that he gets out of that door."

Furthermore, the district court found that Ledbetter's testimony that he did not take any of the robbery proceeds was undermined by his presence at the Rent-A-Center with small denominations of money and an additional stack of bills. Likewise, the district court noted Ledbetter's conduct in telling Morton's mother to remove her license plates was "consistent with somebody who is a knowing participa[nt] in the conspiracy to rob the bank." Finally, the district court noted Ledbetter's criminal history included the possession of firearms and that "the version of events as you laid out in your discussion with your grandmother is a significant admission that in fact you knew that the gun was going to be used in the bank robbery."

The district court ultimately sentenced Ledbetter to 108 months' imprisonment, consisting of 24 months' imprisonment for Counts 1 and 2, and 84 months for Count 3, to run consecutively to Counts 1 and 2. Ledbetter filed a timely notice of appeal.

## II.

On appeal, Ledbetter contests the sufficiency of the evidence supporting his convictions on Count 1 and 3. "In

8

assessing the sufficiency of the evidence presented in a bench trial, we must uphold a guilty verdict if, taking the view most favorable to the Government, there is substantial evidence to support the verdict." Elliott v. United States, 332 F.3d 753, 760-61 (4th Cir. 2003). "[S]ubstantial evidence" is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). We "consider[s] circumstantial as well as direct evidence, and allow[s] the government the benefit of all reasonable inferences from the facts proven to those sought to be established," United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982), and we assume that the fact finder resolved all contradictions in the testimony in favor of the Government. United States v. Brooks, 524 F.3d 549, 563 (4th Cir.), cert. denied, 129 S. Ct. 519 (2008). We "can reverse a conviction on insufficiency grounds only when the prosecution's failure is clear." United States v. Moye, 454 F.3d 390, 394 (4th Cir. 2006) (en banc) (internal quotation marks and citation omitted).

Ledbetter first contests his conviction on Count 1, which charged Ledbetter with violating 18 U.S.C. § 371. That statute makes it a criminal offense if "two or more persons conspire . . . to commit any offense against the United States,

9

. . . and one or more such persons do any act to effect the object of the conspiracy." Id. We have reviewed the evidence in this case and conclude that the Government produced sufficient evidence from which a reasonable fact finder could conclude that Ledbetter conspired to rob the Commerce Bank with Morton. In addition to Morton's testimony regarding Ledbetter's role in planning the robbery, the Government produced circumstantial evidence supporting the verdict.[2] For instance, Hammond testified that he saw a man, Ledbetter, attempting to put something on over his face while sitting in a car behind the bank. This testimony corroborated Morton's testimony that he and Ledbetter parked behind the bank for a period of time and that Ledbetter tried on different disguises in the back seat.

Likewise, the fact that Ledbetter drove the getaway car and was able to drive directly to the interstate despite the presence of multiple turns supported Morton's testimony that it was Ledbetter who chose the bank to rob, having previously lived in northern Virginia. In addition, Ledbetter's presence at the Rent-A-Center with small denomination bills and an additional stack of cash as well as his comments to Morton's mother

---

[2] The district court found incredible Morton's testimony that Ledbetter forced him to rob the bank. Contrary to Ledbetter's assertions, however, the district court did not discredit Morton's testimony that the idea and planning for the bank robbery originated with Ledbetter.

10

regarding the car's license plate were, as the district court found, "completely consistent with somebody who is a knowing participa[nt] in and taken part of the proceeds of the bank [robbery]."

Ledbetter also challenges the sufficiency of the evidence supporting his conviction on Count 3, which charged him with violating 18 U.S.C. § 2 and § 924(c)(1)(A). Section 924(c)(1)(A) creates a graduated penalty scheme for any person who "during and in relation to any crime of violence" "uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." Id. Ledbetter was charged with a violation of subsection (ii), which sets forth a mandatory minimum of seven years imprisonment if the firearm was "brandished." 18 U.S.C. § 924(c)(1)(A)(iii).

Ledbetter contends that there is insufficient evidence to convict him of the § 924(c) violation on the basis of Pinkerton liability. See Pinkerton v. United States, 328 U.S. 640, 646-47 (1946) (holding fellow conspirators liable for substantive offenses committed by a co-conspirator in furtherance of the conspiracy). "A defendant may be convicted of a § 924(c) charge on the basis of a coconspirator's use of a gun if the use was in furtherance of the conspiracy and was reasonably foreseeable to the defendant." United States v. Wilson, 135 F.3d 291, 305 (4th Cir. 1998). See also United

11

<u>States v. Cummings</u>, 937 F.2d 941, 944 (4th Cir. 1991) (applying <u>Pinkerton</u> doctrine that "conspirators liable for all reasonably foreseeable acts of their co-conspirators done in furtherance of the conspiracy" to 924(c) convictions).[3]

We have reviewed the evidence in this case and conclude that the Government produced sufficient evidence to sustain the conviction. Ledbetter overlooks the fact that the district court did not discredit Morton's testimony that Ledbetter, not Morton, brought the gun. Indeed, the district court plainly stated that it did not credit Ledbetter's testimony regarding the presence of the gun, in large part because Ledbetter told his grandmother that he knew Morton had a gun. Also, the district court found, both from testimony and the surveillance videos, that Ledbetter was not testifying truthfully when he said that he did not see Morton using the gun

---

[3] Ledbetter argues that <u>Pinkerton</u> liability for 18 U.S.C. § 924(c) offenses requires the Government to prove to a "practical certainty" that Ledbetter knew Morton would have a firearm. Ledbetter culls this language from <u>United States v. Spinney</u>, 65 F.3d 231, 239 (1st Cir. 1995), which required the Government to meet that burden of proof in aider and abettor liability under § 924(c). In contrast, every circuit, including this court, has applied the familiar <u>Pinkerton</u> liability standard to § 924(c) conspiracy charges. <u>See, e.g.</u>, <u>United States v. Shea</u>, 150 F.3d 44, 50-51 (1st Cir. 1998); <u>United States v. Wilson</u>, 135 F.3d 291, 305 (4th Cir. 1998); <u>United States v. Washington</u>, 106 F.3d 983, 1011 (D.C. Cir. 1997); <u>United States v. Masotto</u>, 73 F.3d 1233, 1240 (2d Cir. 1996); <u>United States v. Myers</u>, 102 F.3d 227, 237 (6th Cir. 1996); <u>United States v. Wacker</u>, 72 F.3d 1453, 1464 (10th Cir. 1995).

12

during the robbery. See United States v. Johnson, 444 F.3d 1026, 1029-30 (9th Cir. 2006) (denying motion for acquittal of § 924(c) charge for getaway driver who never entered bank during robbery because he was present at planning meetings and evidence was presented that the two robbers were wielding firearms in an obvious fashion during the entrance and exit from the bank).

Ledbetter also overlooks that, prior to trial on Counts 1 and 3, he pleaded guilty to armed bank robbery. Armed bank robbery requires the Government to establish that the defendant, in committing bank robbery, "assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device." 18 U.S.C. § 2113(d). It is thus somewhat incongruous for Ledbetter to plead guilty to a crime with the element of "use of a dangerous weapon" but then argue that he did not know Morton would have a gun. See, e.g., United States v. Burton, 126 F.3d 666, 679 (5th Cir. 1997) (affirming sentence enhancement because it was reasonable foreseeable that bank robbery would use a firearm given the "nature of the offense"); United States v. Allen, 425 F.3d 1231, 1234 (9th Cir. 2005) (affirming § 924(c) conviction under Pinkerton where defendant was present at a "morning of" meeting where guns were present and their use was discussed; had a longstanding friendship with a co-conspirator who had participated in previous armed bank robberies; and, finding that "it [wa]s

13

reasonable to infer from the nature of the plan - the overtaking of a bank by force and intimidation - that guns would be used.").

## III.

For the foregoing reasons, we affirm the district court's judgment. Ledbetter's motion to substitute counsel is denied. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED