61 F.3d 904
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Harold Travis STEWART, Defendant-Appellant.
 No. 94-5469.
 United States Court of Appeals, Sixth Circuit.
 July 18, 1995.
 
 Before: JONES and RYAN, Circuit Judges; and MATIA, District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 The defendant, Harold Travis Stewart, appeals his conviction and sentence for armed bank robbery, in violation of 18 U.S.C. Sec. 2113(d); possession of a firearm during a crime of violence, in violation of 18 U.S.C. 924(c); and conspiracy, in violation of 18 U.S.C. Sec. 371. We are asked to determine: (1) whether the district court erred in several evidentiary rulings; (2) whether the district court erred in denying the defendant's motion for judgment of acquittal; and (3) whether the district court erred in increasing the defendant's offense level for bodily injury that occurred during the bank robbery.
 
 
 2
 We conclude that the defendant's arguments are meritless and therefore affirm the judgment of the district court.
 
 I.
 
 3
 The defendant was convicted of robbing the Bellevue Branch of First Security Bank in Nashville, Tennessee, May 26, 1993. The day before the robbery, Michael Blackwell and Joseph Johnson (a/k/a Monty) went to First Security Bank where Blackwell sought and received information on car loans and banking services. Later that day, Blackwell spoke with Stewart by telephone. According to Blackwell, who testified against the defendant, the two spoke of how both of them were financially strapped and of "a way to trying to find a way of getting out of that." Both spoke in street terms about "doing something" and Blackwell understood the talk as referring to doing something illegal. Later that evening, Stewart and Monty met at Stewart's girlfriend's house and talked. Ms. Tina Spivery, who was present, observed the two talking and doodling on paper.
 
 
 4
 On May 26, Blackwell met Stewart at Stewart's house. The two discussed "illegal activities" in which they would be involved. At that point there was nothing specific planned, but robbery was mentioned. Monty then joined Blackwell and Stewart. The three then talked about robberies and about going to Bellevue. Stewart asked Blackwell if he had his gun. Blackwell answered that he did not. Then, either Blackwell or Stewart asked Monty if he had a gun. Monty's response was to display a pistol.
 
 
 5
 Blackwell, Monty, and Stewart proceeded to drive to Samantha Dowling's apartment. According to Ms. Dowling, Stewart asked her to follow them to Bellevue. Stewart also told her "that someone may put a bag in the car, not to touch it, not to look at it."
 
 
 6
 Both cars were then driven to Bellevue. The occupants spent some time searching for a target and ultimately decided on robbing the bank. Blackwell then proceeded to cut holes in a cap given to him by Stewart. Between 10:30 a.m. and 11:00 a.m., Stewart entered the bank and inquired about a car loan application. Stewart returned to Blackwell and Monty and reported to them that there were only five women in the bank. At approximately 11:45 a.m. to 12:00 p.m., one of the bank tellers observed Stewart and Blackwell parked in a parking lot at the back of the bank.
 
 
 7
 Between 12:15 p.m. and 12:30 p.m., Monty entered the bank. Monty announced that it was a robbery and instructed the tellers to give him all of the money. He pointed the gun at several people in the bank, and struck one of the tellers with the gun on the side of her head. Blackwell also entered the bank wearing black sweat pants, a black shirt, one surgical glove, and a mask. Blackwell and Johnson collected $11,418 from the bank and fled through the back door. Stewart picked up Blackwell after the robbery. Later, the police recovered the clothes and the glove from a dumpster.
 
 
 8
 Geary Jackson, a bank customer, witnessed the entire robbery from outside the bank. He followed Stewart's car while calling the police from his car phone. The police stopped Stewart and Blackwell and discovered the mask in plain view in the car. Police took Stewart back to the bank where he was identified as being in the bank earlier in the day. A teller also identified Blackwell as being in the bank the day before the robbery.
 
 
 9
 While in jail, Tina Spivery visited Stewart. Ms. Spivery asked Stewart where the money was hidden. Stewart drew a diagram of where the money could be found. Spivery found the money at the residence that Spivery and Stewart shared in the place designated in the diagram.
 
 
 10
 Following a jury trial, Stewart was convicted of armed bank robbery, conspiracy, and possession of a firearm during a crime of violence. He was sentenced to 70 months on the conspiracy and armed bank robbery counts, and 60 months on the Sec. 924(c) count, to be served consecutively, followed by three years of supervised release. The defendant appeals and urges this court to reverse.
 
 II.
 
 11
 The defendant challenges four evidentiary rulings made by the district court. First, Stewart argues that the district court erred in admitting testimony concerning Officer Tarkington's recovery of money and a gun from Monty's mother's house. Stewart first objected on the grounds that the officer's testimony was hearsay. Stewart also objected on the grounds that the testimony was irrelevant because the government could not prove that the gun found at the house was the gun used in the robbery. The defense moved for a mistrial. The court denied the motion for a mistrial but sustained the objection and gave the following instruction to the jury:
 
 
 12
 Ladies and gentlemen, you will disregard this last statement by the witness about finding a gun in this house. Just disregard that entirely. Disabuse your mind of that completely. All right.
 
 
 13
 This court has established the rule that generally, " 'the subsequent striking of erroneously admitted evidence accompanied by a clear and positive instruction to the jury to disregard it cures the error' unless the stricken evidence is so prejudicial that its harmful effect can not be eliminated." United States v. Chambers, 944 F.2d 1253, 1263 (6th Cir.1991) (quoting United States v. Greene, 400 F.2d 847, 848 (6th Cir.1968)), cert. denied, 502 U.S. 1112 (1992).
 
 
 14
 We are satisfied that the instruction given to the jury was sufficient to preclude any prejudice to the defendant, especially in view of the undisputed evidence that a gun was used during the robbery.
 
 
 15
 Second, Stewart argues that the district court erred in admitting Tina Spivery's testimony regarding the meeting between Stewart and Monty during which she observed the two talking and doodling on paper. The grounds for this assignment of error on appeal are unspecified; trial counsel objected on the grounds that the testimony was "not affirmative evidence of anything."
 
 
 16
 The trial court has broad discretion to determine whether evidence is relevant. Our standard of review is whether the district court has abused its discretion. Bowman v. Koch Transfer Co., 862 F.2d 1257, 1262 (6th Cir.1988).
 
 
 17
 The admissibility of relevant but potentially prejudicial evidence under Fed.R.Evid. 403 is a matter within the discretion of the district court, and the court's determination is reviewed only for an abuse of discretion. United States v. Rural Route 1, Box 137-B, 24 F.3d 845, 852 (6th Cir.1994). "In reviewing the trial court's decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving the 'evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." Laney v. Celotex, Corp., 901 F.2d 1319, 1320-21 (6th Cir.1990) (quoting United States v. Schrock, 855 F.2d 327, 333 (6th Cir.1988)).
 
 
 18
 Plainly, Spivery's testimony of a meeting between Stewart and Monty was probative of the existence of a conspiracy between the three men. The meeting at Tina Spivery's house took place on the same day Monty and Blackwell went to First Security Bank, and on the same day that Stewart and Blackwell discussed their poor financial condition and doing something illegal. The district court did not err in admitting this testimony.
 
 
 19
 Third, the defendant argues that the district court erred in admitting statements made by his coconspirators. This assignment of error was withdrawn during oral argument.
 
 
 20
 Lastly, Stewart argues that the district court erred in refusing to admit four defense exhibits: exhibits 7, 8, 9[1], and 11. The defendant's theory is that this information would have aided him in impeaching Blackwell whose testimony was devastating, to say the least. Exhibit 7 was a bankruptcy petition filed by Blackwell. Exhibit 8 was proof of a lawsuit accusing Blackwell of failing to report income to a partner and failing to give account of business affairs. Exhibit 9 was a judgment against Blackwell for unpaid credit cards. Exhibit 11 was evidence of a criminal charge against Blackwell involving a worthless check.
 
 
 21
 Our examination of the record reveals that Stewart's counsel did not move to admit exhibits 9 and 11. He did, however, utilize exhibits 7 and 8 to refresh Blackwell's recollection. After Stewart's attorney moved to admit exhibits 7 and 8, the district court ruled that they were used to refresh Blackwell's recollection and therefore could not be admitted as substantive evidence. The defendant offered no other theory justifying the admission of the evidence other than to suggest that excluding them from evidence after they were used to refresh recollection was error. The district court correctly excluded the evidence because the use of a document to refresh recollection is not, of itself, grounds to admit the document as substantive evidence, and Stewart offers no authority suggesting that it is.
 
 III.
 
 22
 Stewart's next assignment of error is that the district court erred in denying his motion for a judgment of acquittal. Where a defendant has moved for a judgment of acquittal at the close of the government's case and at the close of all the evidence under Fed.R.Crim.P. 29, our duty is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Vincent, 20 F.3d 229, 233 (6th Cir.1994) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). We are satisfied that the evidence supporting the counts of armed bank robbery, possession of a firearm during a crime of violence, and conspiracy was not only sufficient, it was overwhelming. The district court did not err in refusing to grant Stewart a judgment of acquittal.
 
 IV.
 
 23
 Lastly, Stewart argues that the district court erred in increasing his offense level under Sec. 2B3.1(b)(3)(A) of the sentencing guidelines when it found that the gun contact between Monty, his coconspirator, and a bank teller was accidental. Section 2B3.1(b)(3) states: "If any victim sustained bodily injury, increase the offense level according to the seriousness of the injury." The section then directs courts to increase the offense level by two levels for bodily injury, four levels for serious bodily injury, and six levels for permanent or life-threatening bodily injury. Section 2B3.1(b)(3) is silent on whether the bodily injury must be intentional.
 
 
 24
 Prior to 1988, Sec. 1B1.3 of the sentencing guidelines stated: "Injury relevant to the offense of conviction means harm which is caused intentionally, recklessly or by criminal negligence in the course of conduct relevant to the offense of conviction." The 1988 amendments to the sentencing guidelines deleted this section. The logical assumption of the elimination of this section is that Congress intended to a make a defendant per se accountable for any harm that is caused during criminal conduct, regardless of intent. Nothing in Sec. 2B3.1(b)(3) suggests that the section is inapplicable when the injury is accidental. As a coconspirator, Stewart is accountable for the unintentional injury caused by Monty under Secs. 1B1.3 and 2B3.1 of the sentencing guidelines. Therefore, the district court did not err in increasing Stewart's offense level for bodily injury occurring during the robbery.
 
 V.
 
 25
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Paul R. Matia, United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 The defendant initially states that he is challenging exhibit 10 but then proceeds to discuss exhibit 9 rather than exhibit 10